**In re the SOUTHERTON CORPORATION.**

**The SOUTHERTON CORPORATION, Appellant,**

v.

**UNITED PENN BANK, Appellee.**

**Civ. No. 81–1116.**

United States District Court, M.D. Pennsylvania.

April 28, 1982.

Russell D. Henkin, Paul R. Rosen, Philadelphia, Pa., Lee C. Krause, Honesdale, Pa., for The Southerton Corp.

Arthur L. Piccone, Ronald V. Santora, Wilkes-Barre, Pa., for United Penn Bank.

## MEMORANDUM AND ORDER

NEALON, Chief Judge.

The above-titled action reaches this court following proceedings in the United States Bankruptcy Court for the Middle District of Pennsylvania. The Southerton Corporation, who originally filed the petition under Chapter 11 of the Bankruptcy Code, 11 U.S.C.A. § 1101–1174 (West 1979), from which these proceedings stem, seeks to set aside an order by Bankruptcy Judge Thomas C. Gibbons. By Memorandum and Order dated September 14, 1981, Judge Gibbons granted a petition by the United Penn Bank to terminate the automatic stay imposed by 11 U.S.C.A. § 362(a) (West 1979).

At stake in these proceedings is the disposition of a tract of land situated in Pike County, Pennsylvania. The land, which consists of approximately 236 acres adjoining Lake Wallenpaupack, contains a partially completed mobile and modular home development known as "The Escape." Until recently, The Escape was the principal asset of the Southerton Corporation. On November 10, 1981, however, United Penn purchased the property at a sheriff's sale.

Southerton's appeal raises two issues. First, Southerton contends that the Bankruptcy Judge erred in holding that United Penn's interest in The Escape was not being adequately protected; on the basis of that finding, the Bankruptcy Judge terminated the automatic stay. See 11 U.S.C.A. § 362(d)(1). Second, Southerton argues that the Bankruptcy Judge abused his discretion by failing to set a time for submission of a disclosure statement under Interim Bankr.R. 3005(e), and failing thereafter to set hearings on the proposed plan of reorganization; Southerton asserts that the lack of such hearings deprived it of an opportunity to show adequate protection for the United Penn through periodic payments contemplated by the reorganization plan. United Penn, on the other hand, has not only opposed these arguments, but has also moved to dismiss the appeal; United Penn claims that the sale of The Escape essentially moots this appeal. See Fed.R. Bankr.P. 805 (unless order permitting the sale of property stayed during pendency of appeal, sale to good faith purchaser not affected by modification of order on appeal).

## I. FACTUAL BACKGROUND

Southerton purchased The Escape in 1971. On July 1, 1977, Southerton granted a mortgage on The Escape to the United Penn Bank to secure indebtedness in the amount of $700,000.00. Within a year, United Penn declared the note in default and obtained a judgment by confession in the Court of Common Pleas for Pike County for $609,891.33. In addition, United Penn obtained three other judgment liens against The Escape which, cumulatively, amounted to $48,000.00. In December of 1978, United Penn took possession of the premises as mortgagee. Since that time, Southerton has made no payments to reduce this indebtedness or the interest accumulating thereon.

United Penn ultimately scheduled a sheriff's sale of the property for August 8, 1980. On the same date, however, Southerton filed its Chapter 11 petition, and that filing invoked the automatic stay under

§ 362(a) of the Code, which aborted the planned sale. United Penn responded with a petition for relief from the stay on November 18, 1981 alleging a lack of adequate protection for its interest in The Escape, *see* 11 U.S.C.A. § 362(d)(1) (West 1979), and, alternatively, a lack of debtor equity in The Escape combined with a lack of any reasonable likelihood of achieving a successful reorganization.

The Bankruptcy Judge conducted four days of evidentiary hearings in February and April of 1981 on United Penn's petition for relief. While the issue was under advisement, Southerton moved to stay proceedings on United Penn's petition until hearings could be conducted on Southerton's proposed reorganization plan under 11 U.S.C.A. § 1129 (West 1979). On July 1, 1981, Judge Gibbons denied the request. On July 28, 1981, Southerton filed a motion for leave to appeal that order to this Court. *See In Re the Southerton Corporation,* Civ. No. 81–0879 (M.D.Pa., filed July 28, 1981). Relying on Fed.R.Bankr.P. 802 and Interim Bankr.R. 8004, this court denied Southerton's motion by Order dated October 14, 1981. *See In Re the Southerton Corporation,* Civ. No. 81–0879 (M.D.Pa., October 14, 1981). During the pendency of Civil No. 81–0879 before this court, Judge Gibbons ordered termination of the automatic stay and Southerton filed the present appeal.

Without the constraint imposed by the automatic stay, United Penn rescheduled the sheriff's sale of The Escape for November 10, 1981. On November 4th, Judge Gibbons denied a request by Southerton for supersedeas or an order enjoining sale of the property pending appeal. Southerton thereafter applied to this court for a similar order. This court granted Southerton's motion conditioned upon the filing of a bond in the amount of $50,000.00. No such bond was filed, and the court denied a motion for reconsideration on the date of the sale.

## II. THE MOTION TO DISMISS THE APPEAL

Following consummation of the sale, United Penn moved to dismiss the appeal as moot. In support, United Penn directs this court's attention to Fed.R.Bankr.P. 805. In pertinent part, Rule 805 provides:

> Unless an order approving a sale of property ... is stayed pending appeal, the sale to a good faith purchaser ... shall not be affected by the reversal or modification of such order on appeal, whether or not such a purchaser ... knows of the pendency of the appeal. *Id.*

United Penn asserts that, in good faith reliance on the Bankruptcy Court's order, it purchased the property at the November 10th sale and a deed has been duly recorded. Since the appeal itself did not act as a stay of the Bankruptcy Court's order and since Southerton failed to file a bond, a modification of the Bankruptcy Court's order would in no way affect the sale. Thus, United Penn argues, an inquiry into merits would serve no purpose.

In answer to United Penn's motion, Southerton raises two arguments. First, Southerton insists that the procedural posture of this case does not permit application of Rule 805; that rule, in Southerton's estimation, applies only when an order "approves" a sale. Apparently, Southerton does not regard an order lifting the automatic stay as fitting within that description. Second, Southerton argues that United Penn does not qualify as a good faith purchaser under the rule since the deed reflects that United Penn paid only $1,431.73 for the property. In the court's estimation, Southerton's arguments are devoid of merit.

In its brief, Southerton cites not a shred of authority for a construction of Rule 805 so as to exempt orders granting relief from the automatic stay. Indeed, the United States Court of Appeals for the First Circuit has applied Rule 805 in similar automatic stay litigation. *See Greylock Glen Corp. v. Community Savings Bank,* 656 F.2d 1 (1st Cir.1981). In *Greylock,* as in the present case, a debtor filed an appeal from an order of the Bankruptcy Court granting relief from the automatic stay. Yet the Bankruptcy Court and the District Court denied applications for a stay of that

order during the pendency of the appeal. While the appeal was pending, the creditor purchased the property in question, a tract of land containing a real estate development, at a foreclosure sale. The *Greylock* court noted:

> [Rule 805] is designed to give finality to orders of the Bankruptcy Court that have not been stayed pending appeal. No less than any other potential purchaser, the Bank was entitled to bid upon the Greylock Glen property with the assurance that its title to the property would not be affected by appellate review months or even years later. Appellants, in default on their mortgages, were entitled to no more relief than the Rules and Statutes permitted them.
>
> . . . .
>
> Since the Bank met all the requirements of a good faith purchaser under Rule 805, appellants' prime contention on appeal from the Bankruptcy Court order— that the Bankruptcy Court should have found equity in the property on the part of appellants—is moot.

*Id.* at 4–5 (citations omitted).

Like the *Greylock* court, the court believes that, provided that United Penn qualifies as a good faith purchaser within the meaning of the Bankruptcy Rules, the Bankruptcy Court's determination should be final.

■ Turning to Southerton's argument concerning United Penn's status as a good faith purchaser, the court finds itself equally unpersuaded. Neither United Penn's status as a creditor, *see id.* at 4 (status as creditor does not affect qualifications as good faith purchaser under Rule 805), nor its notice of this appeal prevent a finding of good faith. *See id; In Re Rock Industries Machine Corp.,* 572 F.2d 1195, 1199 (7th Cir.1978). Southerton's sole possible avenue of demonstrating a lack of good faith purchaser status lies in demonstrating a failure to pay value. Pursuing this avenue, Southerton places considerable emphasis on the purchase price at the sheriff's sale. The purchase price of $1,431.73, Southerton urges, cannot be deemed as "value" when even United Penn conceded

that the property is worth at least $360,-000.00.

Undoubtedly, paying "value" is inherent in the concept of the good faith purchaser. Moreover, the value given must bear a reasonable relationship to the actual value of the property. *See Greylock Glen Corporation v. Community Savings Bank,* 656 F.2d at 4 (in context of bankruptcy-related sale, purchaser who pays 75 percent of market value has given "value"); *In Re Rock Industries Machine Corp.,* 572 F.2d at 1193 n. 1 (to the same effect); *In Re Ferris,* 415 F.Supp. 33, 41 (W.D.Okl.1976). If the sheriff's sale purchase price represented the sole value given by United Penn, a serious question concerning its good faith status might arise. As a matter of state law, however, United Penn's "value" given far exceeds the cash amount actually paid.

As United Penn observes in its brief, the price paid represents only the cost of conducting the sheriff's sale. United Penn was entitled to credit against the purchase price of the property amounts outstanding on the underlying judgment. Pa.R.Civ.P. 3133 provides:

Rule 3133 Lien Creditor as Purchaser

> Whenever real or personal property sold on execution is purchased by the plaintiff or any other lien creditor entitled to receive all or some of the proceeds of the sale, the sheriff upon proof of that fact shall accept on account of the purchase price the receipt of the purchaser up to the amount of the proceeds to which he is entitled. The sheriff may require payment in cash of all legal costs distributable from the proceeds of the sale.

*Id.*

Accordingly, the failure to make a cash outlay in some amount exceeding $1,431.73 is not necessarily dispositive of the question of "value" given. In the circumstances of this case, the requirement that the "value" given bear a reasonable relationship to the market value of the property would undoubtedly be satisfied if the sheriff's sale had the effect of extinguishing the outstanding debt to United Penn.

Even accepting Southerton's trial evidence that the value of The Escape equals approximately $960,000.00, United Penn's judgments, including interest, had reached $730,000.00, at the time Southerton filed its original Chapter 11 petition. At that point, the debt already exceeded 75 percent of the purported value of The Escape. Assuming, as the court in *In Re Rock Industries Machine Corp.*, 572. F.2d at 1197 n. 1 did, value equivalent to 75 percent of the property's market value would satisfy the good faith purchaser requirement, discharge of United Penn's judgments would assure its status as a good faith purchaser.

Pennsylvania law severely restricts the lien creditor's power to obtain a deficiency judgment once the creditor has applied the debtor's property to satisfy its judgment lien. Specifically, 42 Pa.Cons.Stat.Ann. § 8103 (Purdon Supp.1980) requires a creditor to seek a judicial determination of the value of property sold as a prerequisite to obtaining a deficiency judgment. In pertinent part, that section reads:

(a) General Rule.—Whenever any property is sold, directly or indirectly, to the judgment creditor in execution proceedings and the price for which such property has been sold is not sufficient to satisfy the amount of the judgment, interest and costs and the judgment creditor seeks to collect the balance due on said judgment, interest and costs, the judgment creditor shall petition the court having jurisdiction to fix the fair market value of the real property sold. The petition shall be filed as a supplementary proceeding in the matter in which the judgment was entered.

. . . .

(c) Action on Petition—

. . . .

After the hearing in the determination by the court of the fair market value of the property sold, the debtor, obligor, guarantor and any other person liable directly or indirectly to the judgment creditor for the payment of the debt shall be released and discharged of such liability to the judgment creditor to the extent of the fair market value of said property as previously agreed to by the judgment creditor or determined by the court . . . and thereupon the judgment creditor may proceed by appropriate proceedings to collect the balance of the debt.

(d) Action in Absence of Petition—If the judgment creditor shall fail to present a petition to fix the market value of the real property sold within the time after the sale of such real property provided by section 5522 (relating to six months limitation) the debtor, obligor, guarantor of any such person liable directly or indirectly to the judgment creditor for the payment of the debt, or any person interested in any real property which would, except for the provisions of this section, be bound by the judgment, may file a petition, as a supplementary proceeding in the matter in which the judgment was entered, in the court having jurisdiction, setting forth the fact of the sale, and that no petition has been filed within the time limited by statute after the sale to fix the fair market value of the property sold, whereupon the court, after notice as prescribed by general rule, and being satisfied of such facts, shall direct the clerk to mark the judgment satisfied, released and discharged.

Under Pennsylvania law, therefore, a lien creditor who causes the sale of a debtor's asset to satisfy a judgment must discharge the debtor to the extent of the fair market value of that property. Without further action, United Penn will have effectively discharge Southerton of the judgment liens and the interest accrued thereon.

Even if United Penn seeks a deficiency judgment, only two scenarios are possible. First, United Penn might fail to establish that the amount of the liens, with interest, exceeds the market value of The Escape. In that case, complete discharge of the liens will have offered sufficient "value" since the Bankruptcy Judge found that United Penn's liens, with interest, equaled at least $730,000.00, which exceeds 75 percent of Southerton market value for The

Escape. Second, United Penn might establish that its liens and interest exceeded the market value of The Escape. In that case, Southerton will at least be assured that United Penn's liens have been discharged to the full extent of the fair market value of The Escape.

█ Thus, in the circumstances of this case, United Penn has given value for its purchase of The Escape through discharge of its outstanding judgment liens. In view of this court's conclusion that United Penn otherwise qualifies as a good faith purchaser, Rule 805 operates to render this appeal moot. Accordingly, the appeal will be dismissed.

## III. THE MERITS

Since the above discussion obviates any need to reach the merits of this case, the court could easily end here. Nevertheless, the court, in the interest of finality, will address the issues raised by Southerton in this case. While both of Southerton's arguments have some apparent plausability on their face, closer examination of these claims reveals a lack of merit bordering on the frivolous.

### A. Adequate Protection.

Southerton's first contention centers upon the adequacy of financial protection that the circumstances provided United Penn. Southerton focuses upon the Bankruptcy court's use of its expert's valuation testimony in the analysis under 362(d)(1). The correctness of the decision appealed, in Southerton's view, turns on whether the 17 percent "equity cushion", which the court assumed arguendo, supplies the necessary protection as a matter of law. As the appellate brief for Southerton puts the matter:

> In essence, then, the holding of the lower court was simply that it assumed that the Debtor's valuation of the premises was correct and that it had a 17 percent equity cushion in The Escape; and that a 17 percent equity cushion in and of itself is insufficient to act as "adequate protection" under 11 U.S.C.A. § 362(d)(1).
> Brief of appellant at 15.

Southerton takes particularly violent exception to the Bankruptcy court's citation to *The Matter of Lake Tahoe Development Corp.*, 5 B.R. 34, 37 & n. 9 (Bankr.D.Nev. 1980). That case contains dicta intimating that the value of partially developed commercial real estate must exceed the debt by 40 to 50 percent before that cushion will protect a secured lender sufficiently. Southerton apparently assumes that the stay was lifted because its equity in The Escape fell short of the 40 percent threshold mentioned in *Lake Tahoe.* Since the Bankruptcy Judge found Southerton's less substantial equity cushion inadequate, Southerton charges that the Bankruptcy Judge "elevated" the dicta in *Lake Tahoe* to a holding in the instant case. Pointing to *In Re Rogers Development Corp,* 2 B.R. 679, 683 (Bankr.E.D.Va.1980), which found as adequate a cushion approximately equal to Southerton's equity in The Escape, Southerton urges this court to reject *Lake Tahoe* and reverse. In this court's view, however, this argument is flawed since it both misreads Judge Gibbons' opinion and misapplies the relevant law.

█ "Adequate protection" is a term of art that has no precise definition in the Bankruptcy Code. The concept stems from pre-Code case law recognizing the need to avoid impairment of the property interest of secured creditors as a matter of constitutional law. *See generally Wright v. Union Central Life Insurance Co.,* 311 U.S. 273, 61 S.Ct. 196, 85 L.Ed. 184 (1940); *Louisville Joint Stock Land Bank v. Radford,* 295 U.S. 555, 55 S.Ct. 854, 79 L.Ed. 1593 (1935). Under the code the concept has been refined:

> The concept is developed from the Fifth Amendment protection of property interests. It is not intended to be confined strictly to the constitutional protection required, however. The section and the concept of adequate protection is based as much on policy grounds as constitutional grounds. Secured creditors

should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or detrimental to the bankruptcy laws. Thus, this section recognized alternative means of protecting a secured creditor's interest. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 339 (1977), U.S.Code Cong. & Admin. News 1978, pp. 5787, 5963, 6295.

Section 361 of the Bankruptcy Code, 11 U.S.C.A. § 361 (West 1979) cites illustrations of the manner in which adequate protection may be afforded. That section provides:

Section 361 Adequate Protection

When adequate protection is required under section 363, 363 or 364 of this title of an interest of an equity in property, such adequate protection may be provided by—

(1) requiring the trustee to make periodic cash payments to such entity, to the extent that the stay under section 362 of this title, use, sale or lease under section 363 of this title, or any grant of a lien under section 364 of this title results in a decrease in the value of such entity's interest in such property;

(2) providing to such entity an additional or replacement lien to the extent that such stay, use, sale, lease, or grant results in a decrease of the value of such entity's interest in such property; or

(3) granting such other relief other than entitling such entity a compensation allowable under section 503(b)(1) of this title as an administrative expense, as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property.

*Id.*

Developing case law under 361 and 362(b)(1) establishes that a debtor may re-

tain sufficient equity in the property to justify maintaining the status quo during bankruptcy proceedings even though § 361 does not specifically recognize such a form of protection. When the property contains a substantial surplus over the debt, the creditor's ability to resort to that property in satisfaction of the debt will, by itself, result in the creditor realizing "the indubitable equivalent" of its interest in the property. *See In Re Rogers Development Corp.*, 2 B.R. at 683.

Precisely the extent to which the debtor's equity must exceed the debt, however, defies quantification. *Compare Matter of Lake Tahoe Development Corp.* 5 B.R. at 37 n. 9 (equity equal to 40 percent to 50 percent of value of partially developed land needed to provide adequate protection) (dicta) *with In Re Rogers Development Corp.* 2 B.R. at 683 (cushion of approximately 17 percent of partially developed land protects creditor adequately); *cf. In Re Pitts*, 2 B.R. 476, 478–79 (Bankr.C.D. Cal.1979) (15.4 percent debtor equity in residence adequately protects creditor). Indeed, the notion that an equity cushion should be considered in a vacuum is fundamentally misguided. The proposition that a uniform equity percentage or dollar amount would inevitably supply adequate protection conflicts with the principle of considering the adequacy of protection in light of all the facts surrounding the case and the equitable considerations to which those factors give rise. *See In Re Pannell*, 12 B.R. 51, 54 (Bankr.E.D.Pa.1981); *In Re 5-Leaf Clover Corp.*, 6 B.R. 463, 466 (Bankr.S.D.W.Va.1980); *In Re San Clemente Estates*, 5 B.R. 605, 609 (Bankr.S.D. Cal.1980). If properly applied, the concept of an "equity cushion" supplies only one factor in determining whether the creditor's interest is adequately protected. *In Re Pannell*, 12 B.R. at 54.

In the proceedings below, the Bankruptcy Judge found that the debtor had failed to prove adequate protection. In the September 14th Memorandum, the Bankruptcy Court critically examined Southerton's contention that its purported equity in the

property provided an adequate cushion in excess of the total debt to insure that the Bank's interest in the property would not be jeopardized during the pendency of the reorganization proceedings. The court, assuming the debtor's valuation of The Escape for the purposes of argument, observed that other factors militated against finding adequate protection on the basis of the equity cushion alone. Weighing the "balance of hurts," the court concluded that the likelihood of harm engendered by continuation of the stay preponderated over the potential harm caused to Southerton by termination of the stay. Far from reaching its conclusion on the basis of some fixed percentage requirement for the equity cushion, the Bankruptcy Court weighed a variety of factors.

■ First, the court noted that the accumulation of interest on the Bank's judgment was rapidly eroding Southerton's equity cushion. Southerton neither questions the appropriateness of considering this factor nor disputes the accuracy of the court's observation. Where, as here, the debtor's margin of equity is slim, the court is clearly entitled to consider the rate at which accumulating interest is absorbing the debtor's equity cushion. *See In Re Rogers Development Corp.*, 2 B.R. at 685; *In Re 5-Leaf Clover Corp.*, 6 B.R. at 466–67. The court believes that the Bankruptcy Judge acted properly in weighing this factor in favor of terminating the stay.

■ Second, the Bankruptcy court observed that the record would not support a finding that the property was significantly increasing in value. Although Southerton stresses the lack of any finding of depreciation in the value of the property, it does not dispute the court's finding. Clearly, changes in the value of real estate provide an important consideration in weighing the adequacy of protection. At least one court has observed that increase in the value of real estate can independently provide adequate protection. *Matter of Pleasant Valley, Inc.*, 6 B.R. 13, 17 (D.Nev.1980). Taken in combination with an equity cushion, an increase in the value of property may

even outweigh rapidly accumulating debt. As the court in *In Re Rogers Development Corporation* noted:

> Although the Plaintiffs are correct that interest and other costs are accruing daily, thereby increasing the amount of the incumbrances against the Property, both appraisers testified that the value of the Property would probably increase over time. This increase in value will help maintain the equity cushion that presently exists by, at least, partially offsetting the increasing amount of indebtedness due to interest and costs continuing to accrue. . . . In this case the Court concludes that although the amount of the equity cushion may decrease daily as a result of the accruing interest and other costs excluding an enhancement of the value in the security, the amount of cushion is sufficiently large at this time to make a granting of the relief from stay a premature action.

2 B.R. at 685.

This court perceives no error in Judge Gibbons' finding that this factor, *viz.*, no evidence of significant increase in value, weighed against continuing the automatic stay.

■ Third, the Bankruptcy Court noted that Southerton had demonstrated an inability to obtain refinancing since the initiation of its Chapter 11 proceeding. Again, the court believes that this factor may carry weight in determining the balance of the equities. Thus, in *In Re San Clemente Estates*, 5 B.R. 605, 611 (Bankr.S.D.Cal. 1980) the court observed:

> There is a strong public policy in maintaining the integrity of banking institutions, especially in these perilous times when we have a particularly unstable banking and monetary system. In the instant case the bank is left with a substantial unproductive loan in its portfolio. However, since the Chapter proceedings were commenced the debtor has worked diligently to solve its problems. The sustained action by the debtor in its attempts to salvage its large investment outweighs the public policy considera-

tions. But the balance could shift if the debtor falters in his performance during the course of these proceedings.

*Id.*

Here, the court hardly thinks that Judge Gibbons abused his discretion by considering Southerton's ability to help finance completion of the development as pertinent to the inquiry. *See In Re San Clemente Estates,* 5 B.R. at 860 (noting that debtor's inability to obtain refinancing bears on the question of prospects for a successful reorganization).

Next, the Bankruptcy Court noted that Southerton had offered no other method of protection that would supply the "indubitable equivalent" of the creditors' interest in The Escape. Here, Southerton contends that adequate protection in the form of periodic cash payments was inherent in its proposed plan for reorganization. The court will deal with this contention in greater detail *infra.* For present purposes, however, the court notes that Southerton did not come forward with any means of providing adequate protection other than its purported equity cushion and the plan of payment contained in the reorganization plan.

■ Fifth, the Bankruptcy Court opined that the current economic conditions do not suggest a realistic prospect for successful rehabilitation or reorganization under Chapter 11. Such an inquiry into the future prospects for the debtor is undoubtedly appropriate. As one court noted:

The degree of protection afforded by an equity cushion must be determined upon supposition as to the future, with a view to the known probing the unknown. By virtue of § 362(g)(2), it is the defendant debtor who has the burden of divining the future and providing the proffered adequate protection.

*In Re Tucker,* 5 B.R. 180, 183 (S.D.N.Y. 1980).

This court discerns no error in the Bankruptcy Court's willingness to consider the ultimate impact of the stay on the parties. This court agrees that subjecting United Penn to a long-term wait for its payment is scarcely equitable if the debtor relies on nothing more than "the faint hope that some miracle may happen." *See Matter of Union Deposit Center Equities Limited Partnership,* 639 F.2d 1045 (3d Cir.1981).

■ Sixth, the Bankruptcy court weighed Southerton's conduct of this litigation. The court indicated that: "one apparent purpose of the filing of the Chapter 11 proceeding was to forestall the pending foreclosure action." Again, the court believes that, in weighing the balance of equities between the parties, the Bankruptcy court is entitled to consider whether the litigation has been undertaken as a deliberate delaying tactic.

Only after considering these other factors did the Bankruptcy court consider the size of the alleged equity cushion. Judge Gibbons neither stated nor implied that an equity cushion of 17 percent would, as a matter of law, fall short of supplying adequate protection in any circumstances. Instead, the opinion states:

*A fortiori,* the Bank is not adequately protected in the event the debt approaches $1.1 Million as the Bank records reflect and if the property is valued at less than $960,000.00. It is significant to note that the valuation on the property assumed an exposure time of 1½ years to offer the property for sale and come up with a buyer for it.

*In Re The Southerton Corp.,* Bk. No. 5–80–1096, Slip op. at 11 (Bankr.M.D.Pa., September 14, 1981).

■ As was proper, the Bankruptcy Judge concluded that these factors, in combination, rendered ineffective any protection that the purported equity cushion might have afforded. Southerton offered a minimal cushion that was rapidly disappearing as interest accumulated. No provision or proposal was offered to maintain the equity cushion at the level on which it stood at the time of trial. Southerton alleges error in the Bankruptcy court's unwillingness to hold the Bank's foreclosure action in abeyance for at least a year and a half despite Southerton's inability to raise

new capital, make any payments on the accruing interest or offer anything other than a plan to repay its debt eventually if it could sell out the remaining lots in The Escape. Adequate protection requires more than the eventual hope of repaying United Penn. There comes a point at which mere resort to the collateral will cease to ensure that the creditor will receive essentially what he bargained for. *In Re Pitts* expressed the matter succinctly:

> No secured creditor structures a transaction in such a fashion that the value of the property equals the amount of his claim. The existence of an equity in terms of collateral value in excess of the secured creditor's claim is an elementary and fundamental part of the transaction.... [T]o deprive the creditor of the right to proceed with foreclosure at a time when a cushion exists and to compel postponement of his remedy in the face of the clearly foreseeable possibility that the cushion may disappear is to expose the secured creditor to risks which were not part of the bargain.
>
> 2 B.R. at 478.

In short, the court considers the Bankruptcy court's determination to be entirely correct. Judge Gibbons gave appropriate weight to a variety of factors in reaching his decision, based on all the circumstances, that United Penn's interest was not being adequately protected. In this court's opinion, Southerton's arguments are not only unfounded, but are based on a patent misconstruction of the Bankruptcy court's holding.

**B. The Failure to Conduct a Confirmation Hearing.**

Southerton's second contention is equally insubstantial. Southerton argues that the Bankruptcy court deprived it of an opportunity to show adequate protection through "periodic payments" inherent in the plan of reorganization. Southerton couches its argument as a construction of Interim Bankr.R. 3005(e). The statement of the issue for Southerton reads as follows:

> Where a debtor, faced with an action to lift the automatic stay of bankruptcy, files a proposed Plan of Reorganization and requests that a confirmation hearing be scheduled, the Bankruptcy Court erred in failing to set a time for submission of a disclosure statement [suggested Interim Bankruptcy Rule 3005(e)], refusing to schedule a confirmation hearing, and refusing, therefore, to consider the availability of such periodic payments in determining the question of "adequate protection" in lifting the automatic stay. Brief of Appellant at i.

From the foregoing statement, one would be surprised to discover that Rule 3005(e) reads: "A disclosure statement ... shall be filed with the plan [of reorganization] or thereafter but not later than a time fixed by the court." Nothing in this provision touches in the slightest manner on the question of scheduling a confirmation hearing. Nothing in this provision sets any priority for hearings either on a disclosure statement of on confirmation of a reorganization plan over hearings on a petition for relief from the automatic stay. Moreover, nothing in the provision even states that a Bankruptcy Judge must set a time for submission of a disclosure statement. A reading of the brief does not even reveal a connection between Rule 3005(e) and the underlying allegations of error that Southerton puts forward.

Stripped of reference to Rule 3005(e), Southerton has conglomerated two contentions in one issue statement. First, Southerton challenges the Bankruptcy court's refusal to stay the disposition of United Penn's request for relief from the automatic stay until a confirmation hearing on the plan of reorganization could be held. Second, Southerton complains of the failure of the Bankruptcy court to consider its reorganization plan as a method of providing periodic payments. Southerton's lengthy dissertation on the alleged failure to set a time for filing a disclosure statement is, in the court's view, irrelevant since Southerton itself maintains that the filing of a disclosure statement was unnecessary in

the circumstances of this case. See Reply Brief of Appellant at 6.

■ Turning to the first claim, that confirmation hearings should have preceded hearings on United Penn's claim for relief, the court finds two independent reasons for rejecting the contention. Initially, the court notes that this contention has been the subject of a prior appeal to this court. When Judge Gibbons denied Southerton's initial request to stay proceedings on United Penn's complaint for relief from the automatic stay, an untimely appeal was filed, and this court dismissed the appeal. *See In Re Southerton Corp.*, Civ. No. 81–0879 (M.D.Pa., October 16, 1981). The effect of the failure to appeal that ruling in timely fashion was to render the Bankruptcy court's order final. Fed.R.Bankr.P. 803; Interim Bankr.R. 8006; 1 Collier on Bankruptcy ¶ 3.03[5] (15th ed. 1981). This argument represents nothing more than a collateral assault on the finality of that order.

Even aside from the failure of Southerton to take an appeal, it is clear that a request for relief from the automatic stay is entitled to priority over other matters on the Bankruptcy court's docket. 11 U.S.C.A. § 362(e) provides:

> (e) Thirty days after a request under subsection (d) of this section for relief from the stay of any act against property of the estate under subsection (a) of this section, such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending, or a result of, a final hearing and determination under subsection (d) of this section. A hearing under this subsection may be consolidated with the final hearing under subsection (d) of this section. If the hearing under this subsection is a preliminary hearing—
>
>> (1) the court shall order such stay so continued if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the final hearing under subsection (d) of this section; and

>> (2) such final hearing shall be commenced within thirty days after such preliminary hearing.
>
> *Id.*

Moreover, Fed.R.Bankr.P. 11–44(d) provides that the court should "set the trial for the earliest possible date, and it shall take precedence over all matters except older matters of the same character." Particularly in light of the view this court has taken of the merits of Southerton's arguments that it was providing adequate protection, the court can perceive no error in the Bankruptcy court's decision not to hold the complaint for relief from the stay in abeyance while confirmation hearings were conducted.

Finally, the court believes that Southerton's insistence that the plan for reorganization provided adequate protection for United Penn altogether lacks support in the relevant case law. Undoubtedly, Southerton's plan provides for payments to United Penn periodically. Merely paying sums to United Penn on occasions falls far short of the "periodic payment" required to give adequate protection. See 11 U.S.C.A. § 361(1).

The periodic payment concept attempts to strike a balance between the concern for creditors and the interest in encouraging successful reorganizations by allowing the debtor to protect the creditor's interest through cash payments offsetting decreases in the value of the creditor's interest in property. *See Matter of Aurora Cord & Cable Co., Inc.*, 2 B.R. 342, 336 (Bankr.N.D.Ill.1980). The cash payments, however, must bear a fair relationship to the decrease in the value of the property. *Matter of Zellmer*, 6 B.R. 497, 499 (Bankr.N.D.Ill.1980); *Matter of Brock*, 6 B.R. 105, 107 (Bankr.N.D.Ill.1980).

Judge Gibbons squarely stated that the present plan bore no such fair relationship to the decrease in the value of United Penn's interest in The Escape. The September 14th Memorandum observes:

> [W]e do not feel that the method of payment outlined in the plan fulfills the "periodic payment" requirement of § 361

since the stay imposed by § 362 has already resulted in a decrease in value of the Bank's interest in the property beyond that which can be remedied by the mere promise of a cash payment from the future sale on individual lots.

Slip. op. at 12.

The Bankruptcy Judge clearly did not abuse his discretion in so finding. The burden of proof was on Southerton to demonstrate that this form of payment would provide adequate protection. 11 U.S.C.A. § 362(g)(2) (West 1979). In the circumstances of this case, relying on the revenues from contemplated future sales to supplement a dwindling equity cushion would be on a par with offering United Penn "pie in the sky."

Both because the issues in this case are moot and because those issues are, at any rate, meritless, the present appeal is dismissed. The Clerk of Court will be directed to close this case.